# STATE OF CONNECTICUT *v.* VINCENT BETANCES
## (SC 16907)

Sullivan, C. J., and Borden, Palmer, Vertefeuille and Zarella, Js.

Argued April 23—officially released August 26, 2003

*Suzanne Zitser*, assistant public defender, for the appellant (defendant).

*Toni M. Smith-Rosario*, assistant state's attorney, with whom, on the brief, were *Michael Dearington*, state's attorney, and *John P. Doyle, Jr.*, assistant state's attorney, for the appellee (state).

*Opinion*

SULLIVAN, C. J. The defendant, Vincent Betances, appeals[1] from the judgment of conviction, rendered after a jury trial, of possession of a narcotic substance, heroin, with intent to sell in violation of General Stat-

---

[1] The defendant appealed from the judgment of the trial court to the Appellate Court, and we transferred the appeal to this court pursuant to Practice Book § 65-1 and General Statutes § 51-199 (c).

utes § 21a-277 (a)[2] and possession of a narcotic substance, heroin, within 1500 feet of a school in violation of General Statutes § 21a-279 (d).[3] The defendant claims that the trial court: (1) improperly denied his motion to suppress eight bags of heroin found on his person in violation of his fifth amendment privilege against self-incrimination under *Miranda* v. *Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966); (2) improperly denied his request for an in camera review of an arresting police officer's personnel files; and (3) improperly instructed the jury that reasonable doubt is "not a doubt suggested by counsel." We affirm the judgment of the trial court.

[2] General Statutes § 21a-277 (a) provides: "Any person who manufactures, distributes, sells, prescribes, dispenses, compounds, transports with the intent to sell or dispense, possesses with the intent to sell or dispense, offers, gives or administers to another person any controlled substance which is a hallucinogenic substance other than marijuana, or a narcotic substance, except as authorized in this chapter, for a first offense, shall be imprisoned not more than fifteen years and may be fined not more than fifty thousand dollars or be both fined and imprisoned; and for a second offense shall be imprisoned not more than thirty years and may be fined not more than one hundred thousand dollars, or be both fined and imprisoned; and for each subsequent offense, shall be imprisoned not more than thirty years and may be fined not more than two hundred fifty thousand dollars, or be both fined and imprisoned."

[3] General Statutes § 21a-279 provides in relevant part: "(b) Any person who possesses or has under his control any quantity of a hallucinogenic substance other than marijuana or four ounces or more of a cannabis-type substance, except as authorized in this chapter, for a first offense, may be imprisoned not more than five years or be fined not more than two thousand dollars or be both fined and imprisoned, and for a subsequent offense may be imprisoned not more than ten years or be fined not more than five thousand dollars or be both fined and imprisoned. . . .

"(d) Any person who violates subsection (a), (b) or (c) of this section in or on, or within one thousand five hundred feet of, the real property comprising a public or private elementary or secondary school and who is not enrolled as a student in such school or a licensed child day care center, as defined in section 19a-77, that is identified as a child day care center by a sign posted in a conspicuous place shall be imprisoned for a term of two years, which shall not be suspended and shall be in addition and consecutive to any term of imprisonment imposed for violation of subsection (a), (b) or (c) of this section. . . ."

The jury reasonably could have found the following facts. On June 20, 2000, Detective Alfonso Vasquez and Officer Quincy Freeman of the New Haven police department were working with the New Haven gang task force. At about 7:19 a.m., the officers, dressed in plain clothes, drove an unmarked vehicle to the intersection of James Street and Woolsey Street in the Fair Haven section of New Haven after the officers learned from a confidential informant that a man was dealing heroin in that area. The informant described the individual as a Hispanic male who was wearing a white T-shirt, blue sweatpants and blue slippers and was walking a small dog with a leash having a red handle. The officers arrived at the scene and Vasquez parked the vehicle. Several seconds later, the officers saw the defendant, who matched the informant's description, walking on James Street toward Grand Avenue. Shortly thereafter, an unidentified white male approached the defendant and, after a brief conversation, engaged in a rapid hand-to-hand transaction with the defendant. On the basis of their training and experience, the officers believed they had witnessed a drug transaction. The exchange took place less than 1500 feet from the Christopher Columbus School, a public school in New Haven.

Vasquez made a U-turn on James Street and began driving toward the defendant. Freeman pulled out his badge, which was on a chain around his neck, opened the door to the vehicle, identified himself as a police officer and ordered the defendant to come over to him. The defendant walked toward Freeman and began pulling items, including money and papers, out of his pockets and discarding them on the ground. Freeman ordered the defendant to remove his hands from his pockets, but the defendant failed to comply. When Freeman came within two feet of the defendant, the defendant backed up, reached into his pocket, put something into his mouth, and then turned and attempted to run

away. Fearing that the defendant was destroying evidence, Freeman grabbed the defendant around the waist from behind and attempted to restrain him. Vasquez then exited the vehicle and attempted to subdue the defendant by grabbing his shoulder. Because the defendant continually reached toward his waistband with his left hand, Vasquez feared that he had a weapon there and attempted to keep the defendant's hand away from that area. The defendant continued to struggle with the officers and attempted to run away, but the officers ultimately subdued and handcuffed him and placed him under arrest for interfering with a police officer.

At that point, Vasquez conducted a patdown search of the defendant and detected a hard, square object in the waist area of his pants. Vasquez opened the defendant's waistband and removed thirty glassine bags labeled, "The Cure," which, after a field test, he confirmed to be heroin.[4] In addition, the officers seized $113 that the defendant had thrown onto the ground.

After other police units arrived, the defendant was placed in the backseat of a police cruiser. While in the back of the cruiser, the defendant began showing signs of medical distress, including paleness, profuse sweating, difficulty breathing and a lack of response to verbal commands. In addition, his eyes rolled toward the top of his head. Vasquez asked the defendant if he had swallowed any drugs, and the defendant replied that he had swallowed four bags of heroin. Fearing for the defendant's safety, the police called for an ambulance. After the defendant was initially treated at the scene, an ambulance transported him to Yale-New Haven Hospital for further treatment. Freeman accompanied the defendant in the back of the ambulance. The emergency

---

[4] Vasquez' field test was confirmed by Catherine Rowe of the state's controlled substance laboratory.

medical technician placed a mask over the defendant's nose and mouth to help him breathe. He also administered Narcan, a medication that prevents cells from absorbing narcotics. Soon thereafter, the defendant asked the emergency medical technician to remove the mask and vomited eight heroin packets labeled "The Cure." Upon arrival at the hospital, Freeman seized the eight packets of heroin.

Prior to trial, the defendant filed a motion to suppress: (1) incriminating statements regarding the alleged ingestion of narcotic substances made to Vasquez and any and all police officers and medical personnel; (2) any and all evidence obtained as a result of any incriminating statement made; and (3) the thirty bags of heroin that were seized from his person. The court granted the motion with respect to the defendant's statement regarding the ingestion of four bags of heroin, concluding that it was the product of an unlawful custodial interrogation. The trial court denied the motion, however, with respect to the second and third issues. The court concluded that Vasquez had seized the thirty bags of heroin from the defendant's person during a lawful search incident to a lawful arrest and that the eight bags of heroin that Freeman had seized after the defendant vomited them were not the fruit of an illegal search.

Also prior to trial, the defendant subpoenaed the office of the corporation counsel of the city of New Haven and the keeper of records of the New Haven police department for, inter alia, Freeman's personnel records.[5] The defendant claimed that those files were

---

[5] The defendant first subpoenaed the keeper of records of the New Haven police department and requested the following:

"(1) Personnel records for Officer Quincy Freeman and Detective [Alfonso] Vasquez.

"(2) Transcripts of any radio communication from or to Detective [Alfonso] Vasquez, Officer Quincy Freeman . . . on June 20, 2000, between 6:30 to 8:15 a.m."

Defense counsel conceded that this subpoena was deficient because the date of appearance requested was April 5, 2000, instead of April 5, 2001.

necessary because Freeman's testimony on the witness stand during the suppression hearing was inconsistent with his police report. The office of the corporation counsel and the department of police services moved to quash the defendant's subpoena of police personnel records. In addition, the state moved for a protective order for those records. The court granted both motions. Following trial, the jury returned a verdict of guilty on both charges, and the court rendered a judgment of conviction. Thereafter, the court sentenced the defendant to a total effective term of seventeen years imprisonment. This appeal followed.

I

The defendant first claims that the trial court improperly denied his motion to suppress the eight bags of heroin that he vomited while traveling in the ambulance that took him to the hospital. The defendant advances three grounds to support his claim. Specifically, the defendant asserts that the court improperly concluded that: (1) the ambulance personnel were not acting as agents of the police and, thus, there was no search or seizure for purposes of the fourth amendment; (2) the eight bags of heroin seized were not fruit of the defendant's statement that had been illegally obtained and thereafter excluded; (3) even if there were an illegal

Furthermore, it was not addressed to the office that maintains police records. A second subpoena, which was addressed to the office of the corporation counsel for the city of New Haven, requested the following information:

"(1) Personnel record for Officer Quincy Freeman including, but not limited to:

"1. Any disciplinary action taken against Officer Freeman.

"2. Any complaints filed by citizens, superiors or fellow officers.

"3. Any reports or lists of any training programs attended.

"(2) Same for Detective [Alfonso] Vasquez."

The defendant withdrew this second subpoena. A third subpoena, similar to the first, was issued to the keeper of records of the New Haven police department. This subpoena was discussed at the hearing, but was never served or made part of the record in this case.

search and seizure, the independent source doctrine applied to preclude exclusion of the eight bags of heroin. The defendant further claims that the plain view doctrine cannot be relied on to support the admission of the evidence when that evidence is the fruit of prior illegal police conduct. The state argues as an alternate ground for affirmance that the statement falls within the public safety and rescue doctrine exceptions to the *Miranda* rule. We agree with the state that the public safety exception is applicable in this case. We therefore conclude that the court improperly excluded the defendant's statement to the police that he swallowed four bags of heroin. Accordingly, we need not reach the remainder of the defendant's claims pertaining to the seized heroin.

"Our standard of review of a trial court's findings and conclusions in connection with a motion to suppress is well defined. A finding of fact will not be disturbed unless it is clearly erroneous in view of the evidence and pleadings in the whole record . . . . [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Colvin*, 241 Conn. 650, 656, 697 A.2d 1122 (1997).

"When a suspect is taken into custody, the *Miranda* warnings must be given before any interrogation takes place." *State* v. *Ferrell*, 191 Conn. 37, 43–44, 463 A.2d 573 (1983). "The primary purpose of the *Miranda* warnings is to ensure that an accused is aware of the constitutional right to remain silent before making statements to the police." Id., 41. "Two threshold conditions must be satisfied in order to invoke the warnings constitutionally required by *Miranda*: (1) the defendant must have been in custody; and (2) the defendant must have been subjected to police interrogation." (Internal quota-

tion marks omitted.) *State* v. *Williams*, 227 Conn. 101, 112, 629 A.2d 402 (1993), citing *Miranda* v. *Arizona*, supra, 384 U.S. 444. "The defendant bears the burden of proving custodial interrogation." *State* v. *Atkinson*, 235 Conn. 748, 759, 670 A.2d 276 (1996).

"[T]he definition of interrogation [for purposes of *Miranda*] can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response." (Emphasis in original; internal quotation marks omitted.) *State* v. *Ledbetter*, 41 Conn. App. 391, 396, 676 A.2d 409 (1996), aff'd, 240 Conn. 317, 692 A.2d 713 (1997), quoting *Rhode Island* v. *Innis*, 446 U.S. 291, 301–302, 100 S. Ct. 1682, 64 L. Ed. 2d 297 (1980); see also *State* v. *Medina*, 228 Conn. 281, 291, 636 A.2d 351 (1994) (concluding that defendant was not interrogated where officer's "conduct was neither intended nor reasonably likely to provoke an incriminatory response from the defendant"). "The test as to whether a particular question is 'likely to elicit an incriminating response' is objective; the subjective intent of the police officer is relevant but not conclusive and the relationship of the questions asked to the crime committed is 'highly relevant.' " *State* v. *Evans*, 203 Conn. 212, 226, 523 A.2d 1306 (1987).

In the present case, the defendant already had been handcuffed and placed under arrest for narcotics offenses and interfering with a police officer when Vasquez asked him "if he swallowed any drugs," and the state concedes that the defendant was in custody at the time that he made the statement. Moreover, Vasquez' question to the defendant whether he had swallowed any drugs was reasonably likely to elicit an incriminating response. Accordingly, the defendant argues, Vasquez' question constituted a custodial interrogation. The state argues, however, that the defendant's statement should not be suppressed because it falls within

both (1) the public safety exception to the *Miranda* rule, and (2) the rescue doctrine or private safety exception. We agree that the defendant's statement fell within the public safety exception. Because we agree with the defendant's observation that the latter doctrine is simply an extension of the first, we need not address the extent to which, if any, a so-called "rescue doctrine or private safety exception" differs from the public safety exception and, therefore, whether such a doctrine would also apply here.

The United States Supreme Court first articulated the public safety doctrine in *New York* v. *Quarles*, 467 U.S. 649, 104 S. Ct. 2626, 81 L. Ed. 2d 550 (1984). In *Quarles*, a young woman approached two police officers in their patrol car and informed them that a man armed with a gun had just raped her. Id., 651. She described her assailant and told the officers that the man had just entered a nearby supermarket. Id., 651–52. The officers entered the supermarket, located a man, Benjamin Quarles, who matched the description given and apprehended him after a brief pursuit through the store. Id., 652. One officer frisked Quarles and detected an empty shoulder holster before handcuffing him. Id. Before reading him his *Miranda* rights, the officer asked Quarles where the gun was, and Quarles responded, "the gun is over there." Id. Quarles subsequently was charged with criminal possession of a weapon. Id. The trial judge granted, and the New York Court of Appeals affirmed, Quarles' motion to suppress both the gun and the statement because the officer had not given him his *Miranda* warnings. Id., 652–53.

The United States Supreme Court, however, reversed the New York Court of Appeals' decision. Id., 660. It held that both the statement and the gun were admissible under the public safety exception because the "concern for public safety must be paramount to adherence to the literal language of the prophylactic rules enunci-

ated in *Miranda*." Id., 653. The court reasoned that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination." Id., 657. Furthermore, the court explained that the exception "simply [frees officers] to follow their legitimate instincts when confronting situations presenting a danger to the public safety." Id., 659. The court "decline[d] to place officers . . . in the untenable position of having to consider, often in a matter of seconds, whether it best serves society for them to ask the necessary questions without the *Miranda* warnings and render whatever probative evidence they uncover inadmissible, or for them to give the warnings in order to preserve the admissibility of evidence they might uncover but possibly damage or destroy their ability to obtain that evidence and neutralize the volatile situation confronting them." Id., 657–58. The court explained that questions must "relate to an objectively reasonable need to protect the police or the public from any immediate danger . . . ." Id., 659 n.8.

Although *Quarles* provided a narrow public safety exception to *Miranda*, the United States Supreme Court has not yet considered whether the public safety exception applies to a police officer's conduct to protect a criminal defendant's safety. Several state and federal courts in other jurisdictions that have considered the issue, however, have applied the public safety exception to situations involving a concern for an individual's safety, including police officers, victims and defendants. See, e.g., *United States* v. *Webb*, 755 F.2d 382, 392 n.14 (5th Cir. 1985) (indicating reluctance "to force a choice between *Miranda* and the neutralizing of a crisis situation created by [defendant's] suicide threats"); *United States* v. *Lutz*, 207 F. Sup. 2d 1247, 1258 (D. Kan. 2002) (explaining that defendant's health and safety come within terms of public safety exception

where officers saw defendant chew and swallow plastic bag commonly associated with packaging drugs and that officer was arguably justified on emergency grounds to ask what defendant had swallowed); *People v. Stevenson*, 51 Cal. App. 4th 1234, 1237, 59 Cal. Rptr. 2d 878 (1996) (finding untenable defendant's argument that "the need for answers to questions in a situation posing a threat to the *public safety* outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination," but "the need for answers to questions in a situation posing a threat to a *defendant's own safety* does not" [emphasis added; internal quotation marks omitted]); *People v. Cressy*, 47 Cal. App. 4th 981, 987, 55 Cal. Rptr. 2d 237 (1996) (determining that there was "no logical explanation why the safety of an officer should be given less deference than the safety of the general public, particularly when the threat to an officer is often of a more immediate nature"); *Benson v. State*, 698 So. 2d 333, 337 (Fla. App. 1997) (applying *Quarles* exception when defendant's own safety was at issue and explaining that "reasoning behind . . . the *Quarles* exception . . . is that a narrow exception should arise when the primary objective of the questioning is to save human life"); *State v. Franks*, 119 N.M. 174, 889 P.2d 209, 214 (App. 1994) ("[w]hen officers respond to a medical emergency and find the victim in such a state that he or she may be unable to communicate later with medical personnel, the officers have a duty to obtain as much information as they can concerning the medically relevant cause of the victim's condition").

We agree with these courts that the public safety exception applies to individual members of the public, including defendants, as well as to the public at large. As the court in *People v. Stevenson*, supra, 51 Cal. App. 4th 1239, stated, "[w]hen a life is in danger, the law should make no distinctions."

In this case, Vasquez' question asking whether the defendant had swallowed any drugs resulted from an objectively reasonable need to protect the defendant from the immediate danger associated with a potential drug overdose. The question was not asked when the officers witnessed the defendant place his hand to his mouth before the officers placed him under arrest and found the thirty bags of heroin around his waistband. Rather, Vasquez asked the question only in response to the defendant's visible medical distress, which included paleness, profuse sweating, difficulty breathing, a lack of response to verbal commands and his eyes rolling toward the top of his head. The officers already had recovered thirty bags of heroin from the defendant and had placed him under arrest for narcotics offenses and interfering with a police officer. It is therefore reasonable to conclude that Vasquez believed that the defendant was in immediate danger if he did not receive medical attention and sought to protect him from a potential overdose.

Accordingly, we conclude that the public safety exception to *Miranda* applies to the defendant's response to Vasquez' question, and, therefore, the trial court improperly excluded the defendant's statements as fruit of a *Miranda* violation. Accordingly, the eight bags of heroin seized were not the fruit of an illegally obtained statement.

## II

The defendant next claims that the trial court improperly denied his request for an in camera review of Freeman's personnel files. The defendant contends, therefore, that this case must be remanded to the trial court for an in camera review of the requested portions of Freeman's personnel files to determine whether there is any exculpatory information contained therein that the defendant could have used on cross-examination.

The state argues, to the contrary, that the court properly determined that the defendant did not provide an adequate factual basis suggesting that there was some specific information in Freeman's personnel file that was relevant and material to the issues before it. The state contends, therefore, that the trial court properly granted the motion to quash the defendant's subpoena for the records and the state's motion for a protective order for those records. We agree with the state.

We review a court's conclusion that a defendant has failed to make a threshold showing of entitlement to an in camera review of statutorily protected records, including police personnel records, under the abuse of discretion standard. See *State* v. *Bruno*, 236 Conn. 514, 529–30, 673 A.2d 1117 (1996) (concluding that "trial court's denial of the defendant's request for an in camera inspection of special education and psychiatric records was not an abuse of its discretion"). We must make every reasonable presumption in favor of the trial court's action. *Walton* v. *New Hartford*, 223 Conn. 155, 169, 612 A.2d 1153 (1992). "The trial court's exercise of its discretion will be reversed only where the abuse of discretion is manifest or where injustice appears to have been done." *State* v. *Leonard*, 31 Conn. App. 178, 199, 623 A.2d 1052, cert. granted on other grounds, 226 Conn. 912, 628 A.2d 985 (1993) (appeal withdrawn January 7, 1994).

"Although public records generally are available pursuant to the Freedom of Information Act, General Statutes § 1-200 et seq., the confidentiality of information in police personnel files that may be relevant to a witness' credibility is protected by General Statutes § 1-210 (b) (2)."[6] *State* v. *Spyke*, 68 Conn. App. 97, 107, 792 A.2d

[6] General Statutes (Rev. to 1999) § 1-210 provides in relevant part: "(a) Except as otherwise provided by any federal law or state statute, all records maintained or kept on file by any public agency, whether or not such records are required by any law or by any rule or regulation, shall be public records and every person shall have the right to inspect such records promptly

93, cert. denied, 261 Conn. 909, 804 A.2d 214 (2002).
"We have found error in the refusal of a trial court
to examine documents in camera where a sufficient
foundation has been laid to indicate a reasonable likeli-
hood that they contain material relevant to the case or
useful for impeachment of a witness. *State* v. *Hufford*,
205 Conn. 386, 404–405, 533 A.2d 866 (1987); *State* v.
*Januszewski*, 182 Conn. 142, 172–74, 438 A.2d 679
(1980), cert. denied, 453 U.S. 922, 101 S. Ct. 3159, 69 L.
Ed. 2d 1005 (1981)." (Internal quotation marks omitted.)
*State* v. *Howard*, 221 Conn. 447, 460, 604 A.2d 1294
(1992). We emphasize that a defendant's request for
information from a confidential police personnel file
"should be specific and should set forth the issue in
the case to which the personnel information sought will
relate." *State* v. *Januszewski*, supra, 173. "No criminal
defendant has the right to conduct a general 'fishing
expedition' into the personnel records of a police offi-
cer. Any request for information that does not directly
relate to legitimate issues that may arise in the course
of the criminal prosecution ought to be denied." Id., 172.

In the present case, the defendant's request for infor-
mation from Freeman's personnel file was not specific
and did not sufficiently set forth the issue in the case
to which the information sought would relate. Rather,
the defendant subpoenaed the "[p]ersonnel records for
Officer Quincy Freeman" and sought "[t]ranscripts of
any radio communication from or to . . . Freeman
. . . on June 20, 2000, between 6:30 to 8:15 a.m." The
defendant stated at the hearing on the motion to quash
that he had subpoenaed Freeman's personnel files to
see "if he has a problem effectuating legal arrests

during regular office or business hours or to receive a copy of such records
in accordance with section 1-212. . . .

"(b) Nothing in the Freedom of Information Act shall be construed to
require disclosure of . . .

"(2) Personnel or medical files and similar files the disclosure of which
would constitute an invasion of personal privacy . . . ."

. . . ." He argued further that he would "like to see if there is a question as to him harassing potential arrestees" by "requiring that [they] either . . . snitch or face arrest." The defendant also stated that he considered his arrest to be retaliatory and that he was concerned about the number of alleged inconsistencies in Freeman's testimony at the suppression hearing. The defendant did not contend, however, that the officers had planted the heroin on him and adduced no evidence suggesting that Freeman had done so to other persons in the past. On that record, the trial court reasonably could have concluded that there was an insufficient nexus between the information requested and the defendant's prosecution, and that the defendant merely was seeking to conduct a "fishing expedition" through Freeman's personnel records.

### III

The defendant's final claim is that the trial court violated our directive in *State* v. *Delvalle*, 250 Conn. 466, 475–76, 736 A.2d 125 (1999), when it instructed the jury, inter alia, that a reasonable doubt was "not a doubt suggested by counsel . . . ." Therefore, the defendant contends, the court's jury instruction constituted reversible error and necessitates that he be given a new trial. The state argues that the defendant is incorrect in asserting that the use of the phrase "a doubt suggested by counsel" is contrary to the directive of *Delvalle* that trial courts abstain from using jury instruction language containing the phrase "a doubt suggested by the ingenuity of counsel." We agree with the state.

The defendant concedes that he failed to file a written request to charge on the matter of reasonable doubt or to take exception to the challenged language. Under *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), the defendant may prevail on an unpreserved constitutional claim "only if *all* of the following condi-

tions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Emphasis in original.) "The first two conditions are determinations of whether a defendant's claim will be reviewed, and the third condition involves a review of the claim itself. . . . When any one of these conditions is not satisfied, the claim will fail." (Citation omitted; internal quotation marks omitted.) *State* v. *Francis D.*, 75 Conn. App. 1, 11, 815 A.2d 191, cert. denied, 263 Conn. 909, 819 A.2d 842 (2003). We will review the defendant's claim because the record is adequate for review and a claim of instructional error regarding the burden of proof is of constitutional magnitude. See *State* v. *Morant*, 242 Conn. 666, 686–87, 701 A.2d 1 (1997) (explaining that jury instruction on concept of reasonable doubt is fundamental constitutional right). We conclude, however, that there was no constitutional violation.

We first set forth the relevant standard of review for a claim of instructional error. "When reviewing the challenged jury instruction . . . we must adhere to the well settled rule that a charge to the jury is to be considered in its entirety, read as a whole, and judged by its total effect rather than by its individual component parts." (Internal quotation marks omitted.) *State* v. *Aponte*, 259 Conn. 512, 517, 790 A.2d 457 (2002). "[T]he test of a court's charge is not whether it is as accurate upon legal principles as the opinions of a court of last resort but whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law. . . . As long as [the

instructions] are correct in law, adapted to the issues and sufficient for the guidance of the jury . . . we will not view the instructions as improper." (Internal quotation marks omitted.) Id.

"[I]n appeals involving a constitutional question, [the standard is] whether it is reasonably possible that the jury [was] misled." (Internal quotation marks omitted.) *State* v. *Delgado*, 247 Conn. 616, 625, 725 A.2d 306 (1999). "The charge is to be read as a whole and individual instructions are not to be judged in artificial isolation from the overall charge. . . . The test to be applied to any part of a charge is whether the charge, considered as a whole, presents the case to the jury so that no injustice will result." (Citations omitted; internal quotation marks omitted.) *State* v. *Prioleau*, 235 Conn. 274, 284, 664 A.2d 743 (1995).

In *State* v. *Delvalle*, supra, 250 Conn. 475, we concluded that a jury instruction defining reasonable doubt as, inter alia, not "a doubt suggested by the ingenuity of counsel," when "taken in isolation, conceivably could misdirect the jury's attention . . . ." (Internal quotation marks omitted.) We rejected the defendant's claim that the jury charge was constitutionally infirm because the court had instructed the jury that reasonable doubt was "not a doubt suggested by the ingenuity of counsel or of a juror 'not warranted by the evidence.' " Id. We explained that "[t]he phrase 'not warranted by the evidence' qualifies the 'ingenuity of counsel' language, and renders even more remote any possibility that the jury was misled by the latter phrase." Id.; see also *State* v. *Hines*, 243 Conn. 796, 819 n.18, 709 A.2d 522 (1998) (when "phrase 'ingenuity of counsel' is immediately succeeded by the phrase 'or by a juror and unwarranted by the evidence' . . . [s]uch language . . . indicate[s] to the jury that doubt may not be created by an argument of counsel or other jurors that is ingenious, but has no basis in the evidence [and it] is an accurate statement

of the law to say that all findings of fact must be supported by the evidence"). To avoid any possibility of juror confusion arising from the use of the phrase, however, "we invoke[d] our supervisory authority over the administration of justice to direct our trial courts to refrain from using the 'ingenuity of counsel' language in the future." *State* v. *Delvalle*, supra, 475–76.

In the present case, the defendant cannot prevail because he has not satisfied the third prong of *Golding*. The court instructed the jury, inter alia, that reasonable doubt is "not a doubt suggested by counsel which is not warranted by the evidence." The court's instruction included the qualifying language, "which is not warranted by the evidence," that saved the instruction in *Delvalle*. We conclude that the court's instructions, when read as a whole and not judged in artificial isolation from the overall charge, presented the case to the jury so that no injustice resulted and did not affect the fairness or integrity of the proceedings or result in a manifest injustice to the defendant.

The judgment is affirmed.

In this opinion the other justices concurred.