[No. B097213. Second Dist., Div. Four. Dec. 23, 1996.]

THE PEOPLE, Plaintiff and Respondent, v.
JEFFREY ANDRE STEVENSON, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II, III, IV, and V.

**COUNSEL**

Brett Harding Duxbury, under appointment by the Court of Appeal, for Defendant and Appellant.

Daniel E. Lungren, Attorney General, George Williamson, Chief Assistant Attorney General, Carol Wendelin Pollack, Assistant Attorney General,

Kenneth C. Byrne and David Andrew Eldridge, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**BARON, J.**—In this case we hold that the police may ask questions of an arrestee which are prompted by a concern that the arrestee's life is in danger as a result of a possible overdose of narcotics without first advising the arrestee of his *Miranda* rights.

### FACTUAL AND PROCEDURAL SUMMARY

Deputy Sheriff Richard Schlegel testified that he was on routine patrol in a high-narcotics area of Los Angeles County on June 1, 1995, about 12:30 a.m., when he first observed appellant Jeffrey Andre Stevenson. Appellant also saw Deputy Schlegel and as the deputy approached appellant, appellant turned and walked rapidly away while, at the same time, placing something in his mouth. As appellant lifted his hand to his mouth, Deputy Schlegel saw a rock of cocaine drop to the ground. Deputy Schlegel arrested appellant, recovered the cocaine, looked in appellant's mouth and observed a white residue in appellant's mouth. It looked to the deputy as if appellant had chewed up cocaine.

Concerned about a possible overdose, Deputy Schlegel immediately transported appellant to a local hospital where he was treated by emergency room physician Dr. Brian Harris. In Dr. Harris's opinion, appellant was at risk of acute myocardial infarction and hemorrhagic stroke. Appellant became combative when the doctor attempted to pump his stomach. Both Deputy Schlegel and Dr. Harris repeatedly asked appellant if he had ingested narcotics. Appellant continually denied ingesting any controlled substances but eventually, after being informed of the risk of coronary artery disease and myocardial infarction, appellant reluctantly admitted he had swallowed six to eight pieces of rock cocaine. As a result, Dr. Harris again attempted to pump appellant's stomach, but aborted the procedure when appellant vomited macerated fragments of what could have been cocaine and seemed in no further danger of an overdose.

Appellant and his friends, Lavell Austin and Anthony Breland, testified appellant had just left a liquor store when he was arrested by Deputy Schlegel for no apparent reason; they did not see appellant with any cocaine and the officer did not find any after searching the area. Appellant denied possessing or ingesting cocaine or anything else prior to his arrest. He

denied that Deputy Schlegel took him to the hospital immediately. They stopped at the police station for five to ten minutes on the way. He also denied telling Deputy Schlegel or Dr. Harris that he swallowed cocaine. Appellant admitted he had been convicted of selling cocaine in 1988 and commercial burglary in 1992; since then he has not used, possessed or sold cocaine and has worked as an in-home nurse.

The jury convicted appellant of possession of a controlled substance in violation of Health and Safety Code section 11350. In a court trial, the 1988 sale of a controlled substance conviction was found true by the court. (Pen. Code, § 667.5, subd. (b); Heath & Saf. Code, § 11370, subds. (a) and (c).) Appellant was sentenced to state prison for four years, granted presentence credit of one hundred eighty days, and ordered to pay a restitution fine of $1,000 pursuant to former Government Code section 13967, subdivision (a). This appeal followed.

DISCUSSION

I.

*The Suppression Motion*

■ Appellant contends that the trial court erred in refusing to suppress evidence of his admission that he had swallowed six to eight pieces of cocaine because he had not been advised of his *Miranda* rights (see *Miranda* v. *Arizona* (1966) 384 U.S. 436, 479 [16 L.Ed.2d 694, 726-727, 86 S.Ct. 1602, 10 A.L.R.3d 974]) before Deputy Schlegel and Dr. Harris questioned him at the hospital. Appellant recognizes that the "public safety" and "rescue" exceptions to *Miranda* hold that "[w]hile life hangs in the balance, there is no room to require admonitions concerning the right to counsel and to remain silent." (*People* v. *Dean* (1974) 39 Cal.App.3d 875, 882 [114 Cal.Rptr. 555].) However, appellant argues the emergency doctrine only applies when the life of a victim, an officer, or the public at large is at risk. Appellant reasons that "the need for answers to questions in a situation posing a threat to the public safety outweighs the need for the prophylactic rule protecting the Fifth Amendment's privilege against self-incrimination" (*New York* v. *Quarles* (1984) 467 U.S. 649, 657 [81 L.Ed.2d 550, 557-558, 104 S.Ct. 2626]) but, "the need for answers to questions in a situation posing a threat to a defendant's own safety does not." Thus, according to appellant, "[w]here the police believe that a defendant's own safety is threatened, they should not be permitted to decide for defendant whether that possible threat justifies an incursion upon his own privilege against self-incrimination; the defendant can . . . make that decision for himself after being properly *Miranda*ized." We find this argument untenable.

"[T]he two basics of the *Miranda* opinion relevant here are (1) its assumption that the purpose of custodial interrogation is to further criminal prosecution, and (2) its public policy to outlaw police misconduct relating to the third degree. Neither point is central to the question of police conduct in emergencies, where the primary objective of police action is to save human life." (*People* v. *Riddle* (1978) 83 Cal.App.3d 563, 574 [148 Cal.Rptr. 170].)

The scope and elements of what constitutes a valid instance of exigent circumstances were well defined in the *Riddle* case. There, the wife of a burglary victim was missing. The police took the burglary suspect into custody and initially asked him questions about the whereabouts of the missing woman without first advising him of his *Miranda* rights. This was held not to be error. *Riddle* determined that when the possibility of saving the life of a missing victim exists, noncoercive questions may be asked of a suspect in custody, even though the answers to the questions may incriminate the suspect. In reaching this decision, the court relied in part on the United States Supreme Court's decision in *Mincey* v. *Arizona* (1978) 437 U.S. 385, 392 [57 L.Ed.2d 290, 299-300, 98 S.Ct. 2408], which stated: " ' "The need to protect or preserve life or avoid serious injury is justification for what would otherwise be illegal absent exigency or emergency." ' [Citation.]" (83 Cal.App.3d at p. 572.) The *Riddle* court then set forth requirements which it deemed sufficient to excuse noncompliance with *Miranda*: "1. Urgency of need in that no other course of action promises relief; [¶] 2. The possibility of saving human life by rescuing a person whose life is in danger; [¶] 3. Rescue as the primary purpose and motive of the interrogators." (*Id.* at p. 576.)

The court in *People* v. *McDermand* (1984) 162 Cal.App.3d 770 [211 Cal.Rptr. 773], applied the *Riddle* rescue doctrine in a situation where it was a noncustodial murder suspect whose life was in danger. The suspect had repeatedly stressed in letters to the sheriff's department and to the press his intent "not to be taken alive." In order to induce the suspect to surrender, the police made false promises and representations to the suspect that they wanted to help not punish him which resulted in a telephone call from the suspect in which he confessed to the murder of his mother and brother. (*Id.* at p. 794.) In holding the suspect's confession admissible, *McDermand* pointed out that " '. . . an interrogation concerning "rescue" might ordinarily have the dual purpose of both rescue and incrimination, but so long as the developed facts show the motive behind the interrogation to be *primarily* that of rescue, the interrogation is justifiable despite an apparent *Miranda* violation.' [Citation.]" (162 Cal.App.3d at p. 797, quoting *People* v. *Willis* (1980) 104 Cal.App.3d 433, 449 [163 Cal.Rptr. 718, 9 A.L.R.4th 578].)

In our view, this case also falls within the purview of the rescue doctrine and we are satisfied that all three *Riddle* requirements are present. The

deputy had a reasonable belief that appellant had consumed cocaine based upon seeing appellant place his hand to his mouth, the recovery of the rock of cocaine which dropped from appellant's hand as his hand went to his mouth, and the white residue in his mouth. Deputy Schlegel had learned at the sheriff's academy that cardiac arrest and death can result from a cocaine overdose. Unsure of the quantity of cocaine and concerned that appellant had taken an overdose, the deputy questioned appellant about the amount of cocaine he had ingested. Appellant denied consuming cocaine, but the deputy thought otherwise. Deputy Schlegel testified that he felt he had an "obligation and responsibility" to make sure that appellant was treated if appellant had, in fact, consumed any narcotics. Thus, for medical reasons, the deputy did not want to book appellant and place him in custody at the station. Instead, he took appellant to the hospital.

At the hospital, Deputy Schlegel informed Dr. Harris that he believed appellant had consumed cocaine. Dr. Harris testified that when appellant was received at the hospital, his heart rate was very elevated, he was anxious, very diaphoretic, sweating, and appeared to be emotional. In the doctor's opinion, appellant's elevated heart rate and other aspects of the physical exam put him at risk for acute myocardial infarction and hemorrhagic stroke. The doctor had seen cardiovascular disease and death and hemorrhagic stroke with people who had ingested small amounts of cocaine. However, other substances also cause a patient to exhibit appellant's symptoms. The doctor attempted to initiate a number of diagnostic modalities to determine which substance appellant ingested, including gastric lavage or pumping his stomach which requires placing an oral gastric tube into his stomach to remove the substances so they could be sent to the lab for analysis. But appellant became combative and would not allow any of the procedures. Thus, the doctor could only rely on "history." Accordingly, both the doctor and the officer inquired many times of appellant if he had ingested any controlled substances that evening. Finally, after explaining to appellant the risk of coronary artery disease and myocardial infarction, appellant reluctantly said he had swallowed some rocks of cocaine.

On the facts we have outlined, we see no rational reason to exclude appellant from the reaches of the rescue doctrine. When a life is in danger, the law should make no distinctions. Accordingly, when it is the arrestee's life which is in jeopardy, the police are equally justified in asking questions directed toward providing lifesaving medical treatment to the arrestee without first warning the arrestee that his answers can be used against him in a court of law. The *Miranda* advisement was meant to protect an accused from the loss of his right to silence, not from the loss of his life. The doctrinal underpinnings of *Miranda* do not require us to exclude appellant's

statement, thus penalizing the deputy for asking the very questions which were the most crucial to the effort to provide appellant with medical treatment. (Cf. *New York* v. *Quarles, supra,* 467 U.S. at pp. 657-658 [81 L.Ed.2d at pp. 557-559].)

## II.-V.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment is affirmed.

Vogel (C. S.), P. J., and Hastings, J., concurred.

Appellant's petition for review by the Supreme Court was denied March 26, 1997.

---

*See footnote, *ante,* page 1234.